# Attachment 3

Clerk of the Superior Court
*** Electronically Filed ***
C. Cuellar, Deputy
9/7/2021 11:39:18 AM
Filing ID 13341404

Scott Griffiths (028906)
**LAW OFFICE OF SCOTT GRIFFITHS PLLC**
201 E Southern Avenue, Suite 207
Tempe, Arizona 85282
Telephone: 602-875-0601
Fax: 602-926-1864
Email: docket@griffithslawaz.com
*Attorney for Plaintiffs*

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| ADELA GIBSON, a single person; RICHARD MOORE, a single person, <br><br>Plaintiffs, <br><br>v. <br><br>CITY OF MESA, a jural entity; [*only* — handwritten annotation] <br>OFFICER J. LAFONTAINE and DOE LAFONTAINE, a married couple; <br>OFFICER A. NAVARRO and DOE NAVARRO, a married couple; <br>OFFICER J. ROZEMA and DOE ROZEMA, a married couple; <br>OFFICER M. CHUEY (#21315) and DOE CHUEY, a married couple; <br>DOE DEFENDANTS 1-10; <br><br>Defendants. | Case No: CV2021-014050 <br><br>**COMPLAINT** |

For her Complaint against Defendants City of Mesa, J. LaFontaine, A. Navarro, J. Rozema, M. Chuey, and Doe Defendants 1-10, Plaintiffs Adela Gibson and Richard Moore allege as follows:

### PARTIES AND JURISDICTION

1. Plaintiff Adela Gibson is a resident of Maricopa County, Arizona.

2. Plaintiff Richard Moore is a resident of Maricopa County, Arizona.

3. Defendant City of Mesa is a political subdivision of the State of Arizona.

4. Defendant J. LaFontaine (#10736) is an officer with the Mesa Police Department. Officer LaFontaine is a member of the SWAT team, or aided the SWAT team, in the events alleged herein. Officer LaFontaine is trained to manage K-9 officers, including Sjo, the K-9 officer used on September 7, 2020, in Richard's arrest.

5. Defendant A. Navarro (#19827) is an officer with the Mesa Police Department. Officer LaFontaine is a member of the SWAT team, or aided the SWAT team, in the events alleged herein.

6. Defendant J. Rozema (#15724) is an officer with the Mesa Police Department. Officer Rozema is a member of the SWAT team, or aided the SWAT team, in the events alleged herein.

7. Defendant M. Chuey (#21315) is an officer with the Mesa Police Department. Officer Chuey is a member of the SWAT team, or aided the SWAT team, in the events alleged herein.

8. Doe LaFontaine, Doe Navarro, Doe Rozema, Doe Chuey are the spouses of Defendants LaFontaine, Navarro, Rozema, and Chuey and are named to bind the marital communities of Defendants LaFontaine, Navarro, Rozema, and Chuey, because the acts of Defendants LaFontaine, Navarro, Rozema, and Chuey were done in benefit and furtherance of their marital communities, if any.

9. Defendants Does 1-10 are defendants whose identities are currently unknown, but who are responsible in whole, or in part, for the claims and damages alleged herein. Plaintiffs will move to add the names of the Doe defendants upon discovery of their identities.

10. For the purposes of Plaintiffs' state law claims, the Defendants were acting within the course and scope of their employment with the City of Mesa and the Mesa Police Department. The City of Mesa is responsible for the actions of its police officers under the theory of *respondeat superior*.

2

11. For the purpose of Plaintiffs' federal law claims, the Defendants were acting under the color of state law.

12. Jurisdiction is appropriate in this court as the events alleged herein occurred in Maricopa County, Arizona, and the damages meet or exceed the jurisdictional limits required for the Superior Court.

## GENERAL ALLEGATIONS

13. Adela Gibson met her boyfriend, Richard Moore, in 2015. They lived in her apartment until late-2016 when Richard received title to a mobile home from his family. In 2018, Richard transferred the title of the mobile home to Adela's name.

14. In mid-2019, Richard began to show increasing anger toward Adela. His anger wasn't physical, and he did not become physically abusive. But his tone and demeanor became mean toward her – and others.

15. After a particularly rough spell where Richard was verbally abusive, Adela told Richard that he had to leave. When Richard refused, Adela simply left their home, drove to the Walmart that was a block away, and called the police.

16. In response, the Mesa Police Department went to her home to talk to Richard. A short time later, officers had convinced Richard to come out of the home and transported to a medical facility that could treat Richard's mental health conditions.

17. Adela then secured an order of protection and had it served on Richard. The order of protection expired a year later – several months before the events alleged herein.

18. The property manager of the mobile home park had Richard trespassed from the property.

19. As a result, when Richard left the mental health facility, he was homeless and without means for providing shelter, food, or medication that he needed to balance his mental health conditions.

20. However, when he is on medications, Richard functions normally.

3

## THE CALL FOR HELP ON SEPTEMBER 7, 2020

21. Although he was homeless, Richard and Adela would meet at various locations in Mesa to spend time together.

22. On occasion, Richard would go by her home to see her and her dog and take the dog for walks.

23. Like many who are homeless, Richard would occasionally relocate where he would stay and move about. So, over the months he would disappear for some time before returning. But Richard's demeanor was normal if he had his medications.

24. In or around August 2020, Richard was away from Adela's home. When he got back in touch with Adela in the first week of September 2020, he was off his medications.

25. Adela pled with him to get back to Community Bridges for medical attention. Adela even made calls to Community Bridges and the Crisis lines, but they refused to talk to her because she was not married to Richard.

26. Richard refused to go back to Community Bridges voluntarily and became angry toward Adela much like he had the year before.

27. On September 7, 2020, Adela left her home for the grocery store. When she returned, Richard was standing on the porch of the trailer and refused to leave. Adela could see that he was in the middle of another mental health break.

28. As she did previously, she simply left the home, went to Walmart, and called the police who dispatched Officers Shumway and Bickle and to meet her at the Walmart.

29. She explained to Officers Shumway and Bickle that Richard was at her home, refused to leave, and she requested that they help him get medical treatment as they had before.

30. She explained to Officers Shumway and Bickle that Richard was not dangerous and there were no guns in the home.

31. She explained that Richard had done this before and was acting the same way.

32. She told Officers Shumway and Bickle that there had been an order of protection previously, but it had expired.

33. She told Officers Shumway and Bickle that Richard does not have a personality for violence but that he is loud and insulting.

34. Officers Shumway and Bickle did not ask permission to enter her home and Adela did not offer Officers Shumway and Bickle permission to enter the home.

35. She explained that her pets were in the home, and she feared for them.

36. At Officers Shumway and Bickle's request, Adela drew a map of the inside of their home so that they would know the layout of the home.

37. Officers Shumway and Bickle kept Adela away from her home as other officers, including the SWAT team, surrounded the mobile home.

38. Mesa Police negotiators and SWAT team members made contact with Richard and talked with him several times. Officers assessed him as having mental health issues and delusions, but the officers did not see any guns or other weapons in his hands.

39. Officers were aware that Adela had stated there were no weapons in the home and that Richard was not armed. The officers at Adela's house were also aware that the order of protection that Adela had secured the year before had expired and that there was no current order of protection.

40. The situation at Adela's home began to stretch out for hours. At the Walmart, Officers Shumway and Bickle asked Adela to draw yet *another* map of the inside of the home.

41. Adela grew concerned and anxious for Richard. She believed that the situation at her home was escalating, and she offered to help by going to the home to talk to Richard.

42. Officers Shumway and Bickle refused to let her go, requiring Adela stay with them at the Walmart parking lot.

43. Adela became agitated with Officers Shumway and Bickle who were refusing to let her return to her home and were asking for another map of the interior of her home. One of the officers flipped on his body worn camera and told her that he was doing that because he sensed that she "might be trouble."

44. Feeling duress from the officer who told her that she might be trouble, Adela complied with the officer's demand for another map.

45. Shortly thereafter, Adela heard explosions coming from the direction of her home only a couple of blocks away.

46. A moment or so later, there were more explosions.

47. The explosions she heard were concussion/stun "grenades" and tear gas/OC spray cannisters being shot through walls, windows, and doors of the home.

48. The amount of gas contained in the gas cannisters that were shot through the walls, doors, and windows of Adela's home was at least enough to cover ten (10) times the square footage of her small home, if not more.

49. A few minutes later, Officers Shumway and Bickle told her that Richard was in custody and that her pets were safe. Officers Shumway and Bickle told Adela that she was not permitted to return to her home for several more hours as police wrapped up their investigation.

50. When Adela did return to her home, she found that the SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants had left the place in shambles.

51. The SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants shot through or smashed out every glass window and door.

52. The SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants destroyed the entire glass-sliding door to the home, leaving the house completely open and exposed.

53. The SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants threw Adela's personal items onto the floor of her home.

54. The SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants ransacked kitchen cabinets and threw items from her countertops onto the floor.

55. The SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants opened and searched spaces where no person could hide and tossed the contents of these spaces on the floor.

56. Adela has a home-based, small business locating, buying, and selling DVDs and videos. The SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants pulled down the bookshelves that held her entire DVD inventory. DVDs were strewn about the floor – some of which were stepped on and destroyed.

57. The SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants smashed out a sliding glass door in the shower.

58. The ceiling in the bathroom was damaged by flying gas cannisters.

59. Flooring was scorched where several gas cannisters landed and became lodged under objects.

60. Ceilings throughout the home had damage from the tear gas/OC spray and the walls, curtains, carpets, and bedding were saturated with tear gas/OC spray.

61. Adela was unable to breathe the air inside the home without coughing and gagging for several weeks after Richard was arrested. Although the smell and flavor of the tear gas/OC spray has dissipated, it has taken months of scrubbing and washing to reduce the effects of the tear gas/OC spray.

62. Due to the damage from the SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants' use of force and entry to her home, Adela's home was wide open to the elements. Because the doors were missing, her personal and business property were at risk for theft or destruction.

63. After assessing the damage from the events of September 7, 2020, the City of Mesa called a service to board up her home. Even though the house is boarded up, it is not sealed. The home still has drafts from outside in the winter and cannot stay cool during summer with air conditioning escaping. Insects and water can get into the home.

## ARRESTING RICHARD MOORE

64. As described herein, the Mesa Police Department had previously had interactions with Richard. Those interactions were documented and available to the dispatchers and officers involved on September 7, 2020. The Mesa Police Department and its officers knew that Richard was not violent or dangerous.

65. In fact, in prior incidents, Richard had been completely compliant with officers and had received mental health and medical assistance he needed.

66. On September 7, 2020, when Adela came home from the grocery store Richard was on the front porch. He was loud and insulting to Adela, prompting her to leave the home and call the police.

67. When she contacted the police, Adela requested that the police locate Richard and assist him in getting medical help as they had in the past.

68. The Mesa Police Department and its officers knew from Officers Shumway and Bickle's interview of Adela at the Walmart, that Richard was having mental health issues.

69. Adela told Officers Shumway and Bickle that Richard did not have weapons, that he had not physically injured her, and was simply not leaving the home as she had asked.

8

70. The Mesa Police Department, via Officers Shumway and Bickle, knew that there was an expired order of protection and that the only possible crime being committed by Richard was trespassing based on the trailer park management's trespassing request from the prior years.

71. Richard was not violent and was not suspected of violence or a violent crime. Richard was not in flight from officers and was responsive to officers when they knocked on the door to the home.

72. When the SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants, responded to the call knocked on the door to the home, Richard did go to the sliding glass door to talk to them. Officers noted that Richard was clearly having a mental health incident as evidenced by his delusional speech.

73. But Richard did not go with the officers as they requested. Instead, he simply told the officers he chose not go and closed the sliding glass door behind him.

74. A few minutes after he closed the sliding door, the SWAT team, including Defendants LaFontaine, Navarro, Rozema, Chuey, and Doe Defendants, began using a bullhorn, ordering Richard to come outside.

75. Richard once again came to the door. As he approached, the officers ordered Richard to put his hands up – and he did.

76. The officers did not issue any commands to Richard and did not tell him that he was under arrest or going to be taken into custody.

77. Richard did not have any weapons in his hands, nor did he threaten the officers.

78. By all accounts, Richard complied with their request to open the door.

79. As he did, Defendant Chuey shot Richard at very close range with a rubber bullet.

80. The shot was so loud and so close that Richard believed he had been shot by a real bullet.

81. Richard recoiled from the rubber bullet and closed the door behind him.

82. Seconds later Defendants Navarro, Rozema, Chuey, and other members of the SWAT team whose identities are currently unknown, began breaking every window by shooting gas cannisters into the house.

83. After the gas cannisters were deployed in the home, Defendant Navarro saw Richard through the windows of the home. Defendant Navarro saw Richard run to the opposite side of the trailer looking for a place to hide and avoid the gas.

84. Despite knowing that the gas was affecting Richard, Defendant Navarro decided to break windows on the east side of the home in order to deploy even more tear gas/OC spray.

85. A decision was made by someone on the SWAT team to enter the home. Defendant Navarro used a ballistic 12-gauge shotgun and a manual tool to obliterate the sliding glass door to enter the home.

86. Richard couldn't breathe due to the gas that had been shot into the home. But he remembered that there was an air vent on the floor in the bedroom. He ran to the bedroom, pulled the vent cover off, and stuck his face in the vent.

87. Keeping his face in the air vent, Richard was lying face down. He covered his head with towels and laundry to stop the gas from getting to his face.

88. SWAT team officers, including Defendants Navarro, Rozema, Chuey, and Doe Defendants acknowledged that Richard was lying face down on the floor with his head and body covered. In fact, they all knew that only Richard's feet were exposed.

89. SWAT team officers, including Defendants Navarro, Rozema, Chuey and Doe Defendants, began shooting Richard with rubber bullets or bean bag rounds. They did so knowing that Richard was mostly covered in towels and laundry and was not armed or a threat to their safety.

90. SWAT team officers and commanders, including LaFontaine, Rozema, Chuey, and Doe Defendants, failed to intervene to stop other officers from pelting Richard – who was lying motionless, face down, on the floor – with bean bag/rubber bullet rounds.

91. Having been shot with a rubber bullet in his chest, unable to breathe due to tear gas/OC spray and having been shot again by rubber bullets as he lied face down on the floor under towels and laundry, Richard continued to lay still.

92. Instead of approaching Richard to cuff him, SWAT team officers, including Doe Defendants, then commanded Defendant LaFontaine and K-9 officer Sjo into the room.

93. Officer LaFontaine yelled multiple commands to Sjo, causing Sjo to attack Richard's exposed legs.

94. Sjo began to bite and pull Richard, who had been lying face down on the floor, across the room.

95. As Richard struggled with the dog, SWAT team officers, including Defendants Navarro, Rozema, and Doe Defendants, started tasing Richard as he remained covered.

96. SWAT team officers and commanders, including Defendants Navarro, Rozema, Chuey and Doe Defendants, failed to intervene to stop Defendant LaFontaine from using Sjo, a police K-9 officer, to repeatedly bite and pull Richard – who was lying face down and motionless on the floor prior to Sjo's first bites.

97. Defendant LaFontaine commanded Sjo to begin pulling Richard toward him. These commands required Sjo to lock onto Richard's leg and pull Richard over carpet and clothing that was covering the floor. If Sjo lost a grip on Richard, Sjo would lock onto Richard's leg again and pull.

98. As a result, Richard began to push away from the air vent and tried to get the dog off of him.

99. It was then that multiple SWAT team officers, including Defendants LaFontaine, Navarro, Rozema, and Doe Defendants, tased Richard and continued to do so until they could get him locked in handcuffs.

100. SWAT team officers and commanders, including Defendants LaFontaine, Navarro, Rozema, and Doe Defendants, failed to intervene to stop officers from tasing Richard, who had been lying face down, motionless on the floor (until Sjo took hold of his leg), from tasing Richard.

101. Richard endured significant pain and trauma as a result of the bean bag/rubber bullet rounds, dog bites, and taser contacts.

102. Richard was arrested and taken to the hospital for treatment. He was then taken to Community Bridges for mental health evaluation and care.

103. Charges against Richard were dropped.

104. But upon information and belief, the charges were refiled after Richard filed a notice of claim with the City of Mesa.

## CLAIMS FOR RELIEF

**COUNT ONE**
**EXCESSIVE FORCE – 42 U.S.C. § 1983**
**(Doe Defendants, LaFontaine, Navarro, Rozema, and Chuey)**

105. Plaintiffs restate the allegations contained above as if fully restated herein.

106. The Fourth Amendment to the United States Constitution, which applies to the Defendants pursuant to the Due Process Claus of the Fourteenth Amendment forbids one who acts under the color of state law from unreasonable search and seizure in violation of a person's security and interests.

107. At all times, Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants were acting under the color of state law.

108. Plaintiffs' right to be free tom unreasonable searches and seizures was well established at the time of the events alleged in the Complaint.

109. Excessive or unnecessary property destruction during a search violates the Fourth Amendment. It was wholly excessive and unnecessary to use shotgun/cannister launchers to destroy every window and door in Adela's home. It was wholly excessive and unnecessary to use more than ten (10) times the tear gas/OC spray necessary for the square footage of the home. It was wholly excessive and unnecessary to destroy Adela's personal and business property, pulling shelves filled with DVDs and videos over, opening and ransacking cabinets and other spaces where a human cannot fit, throwing objects that were sitting on countertops onto the ground, destroying a bathroom shower sliding door, damaging the ceilings and floors of Adela's home, and generally making the home uninhabitable due to the residual tear gas and pepper spray.

110. Each of the foregoing interfered with Adela's possessory interest in her personal and business property.

111. Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants knew that by destroying Adela's doors, windows, bathroom shower doors, personal and business property, outer walls to the home, and by destroying the habitability of Adela's home, they exceeded the scope of any arrest warrant they may have been issued and they were violating Adela's constitutional rights.

112. As alleged herein, Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants violated Adela's constitutional rights and she has suffered damages in an amount to be proven at trial.

113. Likewise, it violates the Fourth Amendment to utilize excessive force in the arrest of a suspect.

114. Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants knew that Richard was unarmed and that he was not known as a dangerous person. They knew that Richard was not wanted for any serious crime and the only crime that he was suspected of was trespassing in the trailer park. Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants spoke with Richard multiple times that evening and each

defendant knew that Richard was mentally ill or, at a minimum, suffering a mental break. Each of the named defendants knew that Richard was suffering from delusions.

115. Despite this knowledge, Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants used excessive force when they shot Richard with a rubber bullet without provocation or warning, caused ten times the amount of tear gas/OC spray necessary for the square footage of the trailer to be fired into the home, fired multiple rubber bullets at Richard and hitting him, used a K-9 officer to bite and pull Richard multiple times causing significant pain and disfiguration, tasered him multiple times, all after finding Richard lying face down on the floor with his head and upper body covered with towels and laundry.

116. At the time that Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants found Richard in the bedroom, Richard did not pose a realistic threat to them. Richard's head, arms, and upper body were covered, and Richard was lying face down with his face in an air conditioning vent.

117. Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants have violated Richard's Fourth Amendment rights. Richard has suffered physical and psychological damages in an amount to be proven at trial.

118. The acts of Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard for Plaintiffs' rights. Plaintiffs, therefore, pray for an award of punitive and exemplary damages against these individual defendants in an amount sufficient to deter such conduct in the future.

119. Pursuant to 42 U.S.C. § 1988 and other applicable law, Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs.

## COUNT TWO
## FAILURE TO INTERVENE – 42 U.S.C. § 1983
### (Doe Defendants, LaFontaine, Navarro, Rozema, and Chuey)

120. Plaintiffs restate the allegations contained above as if fully restated herein.

121. Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants were all acting under the color of state law.

122. Law enforcement officers who have a realistic opportunity to prevent a fellow officer from violating a citizen's constitutional rights have a duty to intervene to protect the victim from injury from unconstitutional retaliation, use of force, or violation of due process of law.

123. As alleged herein, Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants knew that Richard was alone in the home. They knew he did not have weapons and they knew that he was not violent. None of them attempted to intervene to prevent ten times the amount of tear gas/OC spray from being shot into the house or prevent the others from shooting holes in Adela's trailer's walls, or shooting through every glass window and door, or shattering her sliding door in the shower. Instead, each of the Defendants stood by and let the other officers continue their excessive use of force against Adela's trailer.

124. As alleged herein, Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants were each aware that Richard was unarmed and that he was not known as a dangerous person. They knew that Richard was not wanted for any serious crime and the only crime that he was suspected of was trespassing in the trailer park. Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants spoke with Richard multiple times that evening and each defendant knew that Richard was mentally ill or, at a minimum, suffering a mental break. Each of the named defendants knew that Richard was suffering from delusions.

125. Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants failed to intervene to prevent the others from violating Richard's constitutional right to be free from excessive force during an arrest.

126. For instance, Defendants LaFontaine, Navarro, Rozema, and Doe Defendants knew that Richard was not armed but none of them moved to prevent

Defendant Chuey from shooting Richard with a rubber bullet at close range without warning.

127. Defendants Navarro, Rozema, Chuey and Doe Defendants knew that Richard was not a threat to them as he was lying face down on the ground, covered by towels and other materials. Yet they did not attempt to intervene to prevent Defendant LaFontaine from ordering Sjo to attack Richard and bite his leg continually while attempting to pull Richard closer to them.

128. Defendants LaFontaine, Navarro, Chuey and Doe Defendants knew that Richard was unarmed, not considered dangerous, was not fleeing from officers, and was lying face down on the ground, covered by towels and other materials. Yet they did not attempt to intervene to prevent Defendant Rozema from tasing Richard while Richard was being bitten by Sjo.

129. Defendants LaFontaine, Rozema, Chuey and Doe Defendants knew that Richard was unarmed, not considered dangerous, was not fleeing from officers, and complying with officers' instructions. Yet they did not attempt to intervene to prevent Defendant Navarro from using additional tear gas/CS spray in the trailer home, shooting through sliding glass doors with a 12-gauge shotgun, or using manual tools to rip open doorways and walls.

130. The events alleged herein lasted several hours and each defendant had a reasonable opportunity to intervene to prevent harm.

131. Because of the failure of Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants to intervene to prevent additional constitutional harms, Plaintiffs have suffered damages in an amount to be proven at trial.

132. The acts of Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard for Plaintiffs' rights. Plaintiffs, therefore, pray for an award of punitive and exemplary damages against these individual defendants in an amount sufficient to deter such conduct in the future.

## COUNT THREE
## NEGLIGENCE
### (City of Mesa, Doe Defendants, LaFontaine, Navarro, Rozema, and Chuey)

133. Plaintiffs restate the allegations contained above as if fully restated herein.

134. Each of the Defendants owed a duty of care to Plaintiffs to act reasonably to protect Plaintiffs' constitutional rights and to prevent injury to Adela's personal and business property and to Richard's bodily integrity.

135. As alleged herein, Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants have breached their respective duties to Plaintiffs.

136. As a result of Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants' breach of their duty of care, Plaintiffs have suffered harm in amounts to be proven at trial.

137. As their employer, the City of Mesa is vicariously liable for the acts of its employees and agents.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendants and in for Plaintiffs as follows:

A. For actual damages in an amount to be proven at trial;

B. For compensatory, consequential, and incidental damages in an amount to be proven at trial;

C. For punitive and exemplary damages against Defendants LaFontaine, Navarro, Rozema, Chuey and Doe Defendants in an amount to punish the wrongful conduct alleged herein and to deter such conduct in the future for claims arising from violations of federal law only;

D. Awarding Plaintiffs pre- and post-judgment interest on the foregoing amounts at the maximum rate recoverable by law;

E. For Plaintiffs' incurred costs, including attorneys' fees and court costs, pursuant to 42 U.S.C. § 1988 and other applicable law;

F. For other such relief as this Court may deem proper and just.

DATED this 7th day of September 2021.

**LAW OFFICE OF SCOTT GRIFFITHS**

/s/ Scott Griffiths
By: Scott Griffiths
*Attorney for Plaintiffs*